**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| MICHAEL JERMAINE DICKEY AND CAJGIE MCGAHA DICKEY, | Case No. 21-51575-SMS |
| Debtors. | |

**DEBTORS' RESPONSE TO UNITED STATES TRUSTEE'S**
**OBJECTION TO DEBTORS' ELECTION TO PROCEED AS**
**<u>SUBCHAPTER V DEBTORS AND BRIEF IN SUPPORT THEREOF</u>**

Michael Jermaine Dickey and Cajgie McGaha Dickey (collectively, the "**Debtors**" or the "**Dickeys**") file this Response to the United States Trustee's Objection to Debtor's Election to Proceed as Subchapter V Debtors [Doc. 28] (the "**Objection**") and asks this Court to overrule the Objection. In support of this Response, the Debtor respectfully shows the Court as follows:

<u>**INTRODUCTION**</u>

American policy has always encouraged entrepreneurship. Some would say that entrepreneurs built America (with plenty of help, of course). Deeply embedded in the American psyche is the "American Dream" of owning your own business, taking a few risks, and reaping the rewards.  Of course, not every entrepreneur is successful in their initial ventures.  American folklore is replete with examples of entrepreneurs who failed time and again before becoming wildly successful.

Naturally, the American government wants to encourage entrepreneurs to take on the risk of failure. Gone are the days of debtor's prisons—or worse—for risk-takers who find themselves unable to service their debts due to unfortunate twists of fate. Instead, the framers of the American Constitution determined that it was important to have a nationwide bankruptcy system with

uniform laws throughout the country. In so doing, they ensured that entrepreneurs who found themselves victims of misfortune would not be personally destroyed. This awareness of the ability to deal with their debts through the bankruptcy system is a key factor that encourages entrepreneurs to take risks in the first place.

Bankruptcy laws have gone through many stages of evolution. Most notably, of course, was the enactment of the Bankruptcy Code and the creation of bankruptcy courts. Over the last few decades, Congress has enacted several pieces of legislation overhauling the Bankruptcy Code, in recognition that the system is not perfect and continues to be a work in progress. The most recent overhaul was the Small Business Reorganization Act of 2019 (the "**SBRA**" or "**Subchapter V**"). Congress enacted the SBRA with a recognition that Chapter 11 of the Bankruptcy Code, in its then-current form, was designed for large companies and was simply not practical for the vast majority of small businesses and entrepreneurs due to the high cost and complexity.

Over the past year, the global COVID-19 pandemic has devastated the restaurant industry, and the story of Mr. and Mrs. Dickey is unfortunately all too common, making the availability of Subchapter V to people like them more important than ever. Prior to the pandemic and its economic consequences, the Dickeys owned and operated two successful Uncle Maddio's Pizza franchises. As personal guarantors on numerous business loans, they were forced into personal bankruptcy when their restaurants succumbed to the economic downturn caused by the pandemic.

Because the majority of the Dickeys' debt is commercial in nature, they qualify as "small business debtors" under Subchapter V. Further, the Dickeys qualify as "small business debtors" under Subchapter V because Mr. Dickey is actively pursuing consulting opportunities in order to remain in the restaurant industry, and because they own and actively manage and operate income-producing property.

## BACKGROUND

Mr. and Mrs. Dickey are husband and wife. Mr. Dickey is the sole owner of CMR Concepts, LLC ("**CMR I**"), which formed in 2014, and CMR Concepts II, LLC ("**CMR II**"), which formed in 2017 (collectively the "**Businesses**"). (Affidavit of Michael Dickey attached hereto as **Exhibit A**).

Each of the Businesses has operated an Uncle Maddio's pizza franchise location, with Mr. Dickey as the primary manager. (M. Dickey Aff. ¶¶ 5-6). While working in other capacities, Mrs. Dickey remained actively involved in the Businesses, spending her nights and weekends in the restaurants and, alongside her husband, working to build the Businesses. (Affidavit of Cajgie Dickey attached hereto as **Exhibit B**).  Both Debtors were very hands-on in the restaurants, taking orders, ringing up customers, and even making pizzas in the kitchen when they were short-staffed. (M. Dickey Aff. ¶ 10 and C. Dickey Aff. ¶ 5). In order to secure financing related to their ownership and operation of the Businesses, both Debtors became personally liable on numerous business loans. (M. Dickey Aff. ¶ 12 and C. Dickey Aff. ¶ 8). The Debtors both prided themselves on making their restaurants inviting places where families (especially those with young children) could gather and dine in-person together. (M. Dickey Aff. ¶ 11 and C. Dickey Aff. ¶ 7).

When the pandemic struck, the Dickeys heeded the advice of the CDC and the Georgia Department of Health, and they complied with local restrictions in the cities where the Businesses were located, closing the Businesses' doors to dine-in service for the health and safety of customers and employees. (M. Dickey Aff. ¶ 13 and C. Dickey Aff. ¶ 9). Georgia's governor issued a shelter-in-place order on April 2, 2020, which permitted restaurants to offer take-out food, but this was simply not enough. The Dickeys' business model relied on their dine-in customers. The Dickeys tried to increase the volume of their delivery business using delivery apps such as Grubhub and

Uber Eats, but these apps required a 30% share of each order, which made delivery unprofitable. (M. Dickey Aff. ¶ 15).  Sadly, like countless other restaurants, the Businesses could not survive on takeout alone. (M. Dickey Aff. ¶ 14). The COVID-19 pandemic forced the Dickeys to make the sound business and public-health decision to close their doors, at least temporarily.

Their once-thriving Businesses had seen a drop in gross revenue of 60-70% in March 2020 through the end of April 2020 compared to that period the previous year. (M. Dickey Aff. ¶ 16). The Dickeys planned to reopen the Businesses once dine-in service was allowed to resume, but the Businesses could not meet their debt obligations while closed, and both Businesses were forced to terminate their commercial property leases (M. Dickey Aff. ¶¶ 17-18). Also at that point, Ameris Bank, which held a blanket lien on CMR I's property, and Mid First Bank, which held a blanket lien on CMR II's property, responded to the Businesses' financial struggles by repossessing the pizza ovens, under-counter cookers, shelves, tables, chairs, restaurant utensils, and booths from each location. (M. Dickey Aff. ¶ 18). The Dickeys were absolutely devastated to see the decade worth of work that they poured into their Businesses ripped away.

The COVID-19 pandemic forced both CMR I and CMR II to begin winding down their operations, culminating with each filing chapter 7 bankruptcy cases on August 10, 2020 (Case nos. 20-68843 and 20-68844). (M. Dickey Aff. ¶ 19). The Debtors attempted to work out payment plans with each creditor for which they had personally guaranteed business loans and hoped to avoid being forced into personal bankruptcy, but Ameris Bank sued the Debtors on their personal guarantees, received a judgment, and began to garnish Mrs. Dickey's paycheck and a joint bank account, necessitating the filing of the instant bankruptcy case. (M. Dickey Aff. ¶ 23 and C. Dickey Aff. ¶ 12). At the time of filing this case, the Dickeys were current on all of their non-business

debt obligations, including mortgage payments, car payments, and credit card payments. (M. Dickey Aff. ¶ 24 and C. Dickey Aff. ¶ 13).

At the time of the filing this bankruptcy case, Mr. Dickey was actively pursuing consulting work in the restaurant industry, specifically with other Uncle Maddio's franchise owners. (M. Dickey Aff. ¶ 26-28). Mr. Dickey continues to seek consulting opportunities, and he intends to remain in the restaurant industry as the forces of the pandemic wane and our economy begins to recover. (M. Dickey Aff. ¶ 28-29).

In addition to the Businesses, the Dickeys own and operate a single-family rental property that they purchased as an investment. (M. Dickey Aff. ¶ 30 and C. Dickey Aff. ¶ 15). The Debtors actively manage the income-producing property, which includes paying the mortgage and utilities each month, cutting the grass and maintaining the landscaping, and visiting the property several times each month to perform routine maintenance. (M. Dickey Aff. ¶ 31 and C. Dickey Aff. ¶ 16).

As shown in the Debtors' Schedules filed in this case [Doc. 21], their total business debt vastly exceeds their consumer debt. The majority of the Dickeys' debt is commercial in nature, and the instant bankruptcy case was filed with the intent to reorganize that business debt. (M. Dickey Aff. ¶ 25) and C. Dickey Aff. ¶ 14).

<u>**ARGUMENT**</u>

**A. Congress intended a broad interpretation of who may qualify under Subchapter V, consistent with the longstanding American policy of encouraging entrepreneurship.**

When enacting the SBRA, Congress intended to broaden the relief available to small business owners by streamlining the bankruptcy process by which they reorganize and rehabilitate their financial affairs. H.R. REP. No. 116-171 at 1-2 (2019); *In re Ventura*, 615 B.R. 1 (Bankr. E.D. N.Y Apr. 10, 2020). In order to qualify to be in a Subchapter V, a debtor must meet the definition of a "small business debtor," which the SBRA amended to mean:

> a person engaged in commercial or business activities . . . that has aggregate noncontingent liquidated secured and unsecured debts as of the date of the filing the petition or the date of the order for relief in an amount not more than $2,725,625.00 . . . not less than 50 percent of which arose from the commercial or business activities of the debtor.

11 U.S.C. § 101(51D). In 2020, through the enactment of the Coronavirus Aid, Relief, and Economic Security Act ("**CARES Act**"), Congress further expanded access to Subchapter V for small business owners by raising the debt limit to $7,500,00.00.

The intent of Congress in passing both the SBRA and the CARES Act was to expand access to the bankruptcy system and increase the number of successful reorganizations. "Congress recognized that many of the benefits afforded to large corporate debtors under chapter 11 were for all practical purposes out of the reach of smaller businesses." *In re Ventura*, 615 B.R. 1 (Bankr. E.D. N.Y Apr. 10, 2020). "Chapter 11 is often an expensive and highly complicated proposition." *Id.* "Many small businesses have neither the money nor the time to navigate the process, even with the considerations given to small businesses prior to the enactment of the SBRA." *Id.*

Congress intended to give Debtors like the Dickeys—for whom chapter 11 would be too cumbersome, expensive, and complex—a viable reorganization option in the form of Subchapter V. With a total debt amount of just over $1.3 million—the majority of which stems from business debts—the Dickeys are the type of debtors whom this law was enacted to help. The traditional Chapter 11 process is just too complex and expensive to really work for small business debtors like them.

The Dickeys filed this case to address their business debts, and no purpose is served by barring their access to the relief that Congress has made available to them. In the Objection, the United States Trustee raises some highly technical arguments without addressing the policy underlying the SBRA or any of the practical realities that entrepreneurs face.

As the House Judiciary Committee Report on the SBRA notes, "Small businesses—typically family-owned businesses, startups, and other entrepreneurial ventures—'form the backbone of the American economy.'" H.R. REP. No. 116-171 at 2 (2019) (*quoting Am. Bankr. Inst., Final Report and Recommendations of the Commission to Study the Reform of Chapter 11*, at 276 (2014)). Families like the Dickeys, who are willing to take out business loans and take the risk of opening small business, employ the majority of Americans. "It is estimated that companies with 50 to 5,000 employees account for more employment than those with over 5,000." *Id.* As one of the earliest courts to examine the SBRA aptly noted, "[t]hese types of debtors who are willing to risk everything to start and maintain their own business should not be penalized, rather, they should be applauded." *In re Ventura*, 615 B.R. 1, 18 (Bankr. E.D.N.Y. 2020).

**B. The Dickeys are small business debtors because their entrepreneurship led to the very debts they seek to reorganize.**

By design, the definition of "small business debtor" in the Bankruptcy Code could not be much broader. On the one hand, the debt limits and requirements that the majority of the debts relate to business activities establish bright lines with respect to what Congress meant by "small." *See* 11 U.S.C. § 101(51D). But on the other hand, what does it mean to be a "business debtor"? According to Congress, the definition should include any "person engaged in commercial or business activities." *Id.* This definition would seem to encompass just about anyone in America who works for a living.[1]

It is difficult to imagine broader language and to reach any other conclusion than that Congress intended to give bankruptcy judges vast discretion and flexibility to determine which debtors may qualify as small business debtors in appropriate circumstances. Congress could have

---

[1] At least one bankruptcy judge in this district has confirmed a Subchapter V plan for a W-2 employee, even after a creditor objected to the debtor's eligibility to proceed under Subchapter V (but later withdrew that objection). *See In re Ford*, Case No. 20-bk-66832 (Bankr. N.D. Ga. 2020).

adopted a narrower definition, such as being an "owner of a currently operating business" or some other such restriction, but it did not. Instead, it adopted just about the broadest definition possible.

As the United States Trustee recognizes in the Objection, several courts around the country have focused on the "engaged in" language contained in the statute. Most of these cases conclude that it is inappropriate to adopt a hyper-technical reading of the statute that would only allow a debtor to qualify as a small business debtor where they are ***currently*** operating a particular business. *See In re Wright*, 2020 Bankr. LEXIS 1240 (Bankr. D.S.C. Apr. 27, 2020); *In re Bonert*, 2020 Bankr. LEXIS 1783 (Bankr. Central Dist. Cal. Jun. 3, 2020); *In re Blanchard*, 2020 Bankr. LEXIS 1909, 2020 WL 4032411, at *2 (Bankr. E.D. La. July 16, 2020) (observing that "the statute neither qualifies 'engaged in' as currently nor formerly 'engaged in.'").

Even courts which construe the statute to impose a temporal obligation to be "engaged in" business recognize that an "actively carrying out" test is "too narrowly fashioned." *See In re Johnson*, 2021 Bankr. LEXIS 471 (Bankr. N.D. Texas Mar. 1, 2021).

In what appears to be the seminal case addressing this issue, *In re Wright*, a South Carolina bankruptcy court considered a situation nearly identical to this case, where the debtor (an individual) closed his business entities in 2018 and filed a Subchapter V case in February 2020. The *Wright* court concluded that, because the majority of the debtor's indebtedness was related to commercial loss, the debtor qualified to be a "small business debtor" under the SBRA definition. The Court observed that "nothing [in the SBRA], or in the language of the definition of a small business debtor, limits application to debtors ***currently*** engaged in business or commercial activities." *Wright*, 2020 Bankr. LEXIS 1240 at *7.

In its analysis, the *Wright* Court considered the intention of Congress in enacting Subchapter V and concluded that it did so to "broaden relief available to address small business

debt." *Id* at *7. The *Wright* Court also cited to *Collier on Bankruptcy*, quoting the following language:

> The definition of a "small business debtor" is not restricted to a person who at the time of the filing of the petition is presently engaged in commercial or business activities and who expects to continue in those same activities under a plan of reorganization. That person may have incurred $2,725,625 in noncontingent, liquidated, secured and unsecured debts that arose from business activities before the date of the filing of the case, but as of the petition date may have discontinued those business activities. There is nothing in the legislative history to suggest that in this latter instance, the small business amendments should not apply to that person.

*Id* at *7 (*quoting Collier on Bankruptcy* ¶ 101.51D (16th ed. 2020)); *see also In re Bonert*, 2020 Bankr. LEXIS 1783 (Bankr. Central Dist. Cal. Jun. 3, 2020) (following *Wright* and permitting debtors (married individuals) to proceed under Subchapter V even though they had closed their business prior to the petition date).

Just like the debtor in the *Wright* case, the majority of the Dickeys' indebtedness is related to commercial losses, and the sole reason that they filed this case is to address their small business debts. Thus, the Dickeys qualify to be debtors under Subchapter V.  The facts here are perhaps even more compelling due to the fact that the Dickeys did not cease operations until forced to do so by the once-in-a-century COVID-19 pandemic that has wrought worldwide devastation, but for which they would almost certainly be operating the Businesses to this day.

As the Trustee cites in the Objection, two bankruptcy courts have taken the opposite stance, holding that the plain meaning of "engaged" means to be actively engaged in commercial or business activities at the time of filing. *See In re Thurmon,* 2020 Bankr. LEXIS 3422 (Bankr. W.D. Mo. Dec. 8, 2020); *see also In re Johnson,* 2021 Bankr. LEXIS 471 (Bankr. N.D. Texas Mar. 1, 2021). Respectfully, the Debtors believe that the *Thurman* court and the *Johnson* court reached the wrong outcomes by ignoring practical realities and Congressional intent and resorting to

dictionaries instead of common sense. As the *Wright* court observed, "'To determine a statute's plain meaning, [the Court] not only look[s] to the language itself, but also the specific context in which that language is used, and the broader context of the statute as a whole.'" *Wright,* 2020 Bankr. LEXIS 1240 at *6 (*quoting Othi v. Holder*, 734 F.3d 259, 265 (4th Cir. 2013)). And as a whole, the SBRA, Congress's intent to aid small business owners, and the entire history of American policy with respect to entrepreneurship compel the conclusion that a hyper-technical out-of-context reading of the statute is inappropriate.

### C. The Dickeys are engaged in commercial and business activities.

In any event, the Court need not decide whether to address the legal issue of statutory interpretation and decide which other courts got it right or wrong, because the Dickeys continue to be engaged in commercial and business activities. They continue to actively manage their rental property, and Mr. Dickey continues to explore entrepreneurial opportunities to remain in the restaurant industry as an independent consultant or otherwise.

With respect to the rental property, this is not a single asset real estate case (the Debtors have other significant assets), and this is not a situation where the Dickeys are mere investors, absentee landlords who hire a property manager to handle the day-to-day property management. Instead, they do this work themselves. (M. Dickey Aff. ¶ 31 and C. Dickey Aff. ¶ 16); *see In re Blanchard*, 2020 Bankr. LEXIS 1909, 2020 WL 4032411, at *2 (Bankr. E.D. La. July 16, 2020) (identifying factors it considered when determining eligibility for Subchapter V, including among other things the debtors' ownership of rental properties and personal guarantees on business debts).

Mr. Dickey's intent to remain an entrepreneur in the restaurant industry is also a key factor to consider. While not controlling, cases under Chapter 12 of the Bankruptcy Code are helpful for determining Congressional intent with respect to the SBRA. "Congress did not write on a blank slate when utilizing the language" defining small business debtors or when enacting the SBRA.

*Johnson*, 2021 WL 825156, at \*7. In fact, Congress previously used the same language in the eligibility provisions applicable to chapter 12 of the Bankruptcy Code, which is applicable to family farmers.  Under 11 U.S.C. § 101(17)(A), to qualify as a "family farmer" for purposes of a chapter 12 reorganization, a debtor "must be 'engaged in a farming operation' when they file the Chapter 12 petition." *In re Watford*, 898 F.2d 1525, 1527 (11th Cir. 1990).

The Eleventh Circuit has adopted a standard that examines "whether, in view of the ***totality of the circumstances***, the debtor intends to continue to engage in a 'farming operation' even though he or she was not engaged in the physical activity of farming at the time the petition was filed." *Id.* (emphasis added).  In holding that the debtors' intent is a relevant inquiry, the Eleventh Circuit Court of Appeals aptly noted that "[c]learly, Congress did not intend that farmers who make sound business decision pre-bankruptcy in an effort to remedy their financial woes . . . should be excluded from Chapter 12 relief when their immediate intention is to reorganize by actually farming." *Id.* at 1529 (internal citation omitted).

It is common for farmers to let fields lie fallow to allow nature to rejuvenate the soil. According to the Eleventh Circuit, such actions would not disqualify farmers from being eligible under Chapter 12. Similarly, the forces of nature—particularly the worldwide COVID-19 pandemic—forced many restaurants to close, some temporarily, some permanently. It would seem that under the United States Trustee's interpretation, even the owners of restaurants that were closed temporarily would not qualify under Subchapter V if they were not "currently" operating. Such a result would be nonsensical and contrary to the Eleventh Circuit's guidance in *Watford*.

The SBRA was enacted prior to the COVID-19 pandemic. "Had Congress been given a crystal ball with the power to see what the world is facing today, including the severe disruption to our Nation's economy and its impact on small businesses, Congress likely could not have drafted

a more effective set of mechanisms to help these businesses reorganize and hopefully survive."
*Ventura*, 615 B.R. at 6.  Of course, hindsight is always 20/20, which is perhaps why Congress and
the Eleventh Circuit have adopted such flexible tests, giving bankruptcy courts wide discretion to
hold that debtors are eligible to proceed under Subchapter V in appropriate cases like this one.

<u>CONCLUSION</u>

For the reasons set forth above, the Court should overrule the Objection and determine that
the Debtors are eligible to proceed under Subchapter V of Chapter 11 of the Bankruptcy Code.

Dated: April 14, 2021                    Respectfully submitted,

                                         ROUNTREE LEITMAN & KLEIN, LLC

                                         */s/ Benjamin R. Keck*
                                         William A. Rountree, Ga. Bar No. 616503
                                         Benjamin R. Keck, Ga. Bar No. 943504
                                         Elizabeth A. Childers, Ga. Bar No. 143546
                                         Century Plaza I
                                         2987 Clairmont Road, Suite 175
                                         Atlanta, Georgia 30329
                                         (404) 584-1238 Telephone
                                         wrountree@rlklawfirm.com
                                         bkeck@rlklawfirm.com
                                         echilders@rlklawfirm.com
                                         *Attorneys for the Debtors*

**Exhibit A**

**Michael Dickey Affidavit**

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| MICHAEL JERMAINE DICKEY AND CAJGIE MCGAHA DICKEY, | Case No. 21-51575-SMS |
| Debtors. | |

## <u>AFFIDAVIT OF MICHAEL JERMAINE DICKEY</u>

1.     My name is Michael Jermaine Dickey. I am over 18 years old and am competent to give this affidavit. I have personal knowledge of the facts contained in this affidavit.

2.     I am an individual Debtor in the bankruptcy proceeding filed by myself and my wife, Cajgie Dickey, on February 25, 2021, pending in the Northern District of Georgia, case number 21-51575.

3.     I have been working in the restaurant industry since I was 17 years old.

4.     I began a career in restaurant management 25 years ago. I have worked for several large corporations in restaurant management, including Darden Restaurant Group, the Applebee's Company, Dave and Busters and Rio Bravo.

5.     Most recently, I owned and operated two Uncle Maddio's pizza franchise locations (the "Restaurants.").

6.     Each location was owned by an entity for which I was the 100% shareholder: CMR Concepts, LLC ("CMR I") and CMR Concepts II, LLC ("CMR II").

7.     CMR I was formed in 2014 and opened an Uncle Maddio's location that same year in Smyrna, Georgia.

8.    CMR II was formed in 2017 and opened an Uncle Maddio's location that same year at on Acworth, Georgia.

9.    My wife and I both worked extremely hard to make the Restaurants successful.

10.    I was very hands-on in operating the restaurants, filling in in the kitchen making pizzas when needed, taking orders and serving guests.

11.    We worked to create inviting places where families, especially those with children, could gather together and dine in-person.

12.    My wife and I both personally guaranteed numerous business loans in order to secure financing for CMR I and CMR II.

13.    In March 2020, when the global COVID-19 pandemic struck, we heeded the advice of the CDC, the Georgia Department of Health, and local restrictions from the cities of Smyrna and Acworth and shut our doors to dine-in business for the health and safety of our customers and employees.

14.    We remained open for takeout but could not survive on the revenue from takeout alone.

15.    We attempted to increase our delivery business using delivery apps such as Grubhub and Uber Eats, but the apps required a 30% share of each order and it was not profitable.

16.    The Restaurants saw a drop in gross revenue of 60-70% in March 2020 through the end of April 2020 compared to that period the previous year.

17.    We closed the Restaurants completely at the end of April 2020 with the intention of reopening once the city of Smyrna and city of Acworth allowed restaurants to resume dine-in business but we were not able to maintain debt service payments while the Restaurants were closed.

18.    Both locations defaulted on their commercial property leases and the lenders who held blanket liens, Ameris Bank for CMR I and Mid First Bank for CMR II, repossessed the pizza ovens, under-counter cookers, shelves, tables, chairs, restaurant utensils and booths from each location in July 2020.

19.    CMR I and CMR II each filed a chapter 7 bankruptcy case on August 10, 2020.

20.    CMR I's case, 20-68843, has closed.

21.    CMR II's case, 20-68844, is still pending.

22.    My wife and I tried to avoid personal bankruptcy, but we could not work out payment plans with the lenders on the personal guarantees we owed for the business loans.

23.    Ameris Bank sued us on the personal guarantees, got a judgment against us and began to garnish my wife's paycheck as well as a joint bank account.

24.    When we filed this bankruptcy case, we were current on all of our personal obligations, including mortgage payments, car payments and credit card payments.

25.    The sole reason we filed bankruptcy was to deal with the business debt.

26.    Currently I am seeking work in the restaurant industry and trying to establish myself as a consultant.

27.    I specifically am trying to consult with other Uncle Maddio's franchise owners.

28.    I am actively engaged in this endeavor and have reached out to many of my contacts in the industry to try and establish myself and my new business.

29.    I am also consulting on a new app platform for use in the restaurant industry.

30.    My wife and I also own and operate a single-family rental home located at 1998 Pine Hill Circle, Kennesaw, Georgia 30144.

31.    My wife and I are both actively engaged in managing the rental property, which includes paying the mortgage and utilities each month, cutting the grass and maintaining the landscaping, and visiting the property several times each month to perform routine maintenance.

FURTHER AFFIANT SAYETH NOT.

Sworn to and subscribed before me

this 14 day of April, 2021.

_____

Notary Public

_____
Michael Jermaine Dickey

This Affidavit was executed and notarized in counterparts pursuant to Executive Order 04-09-20-01 using a Zoom video call as real-time audio-visual communication technology.

**Exhibit B**


**Cajgie Dickey Affidavit**

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| MICHAEL JERMAINE DICKEY AND CAJGIE MCGAHA DICKEY, | Case No. 21-51575-SMS |
| Debtors. | |

## AFFIDAVIT OF CAJGIE MCGAHA DICKEY

1.      My name is Cajgie McGaha Dickey. I am over 18 years old and am competent to give this affidavit. I have personal knowledge of the facts contained in this affidavit.

2.      I am an individual Debtor in the bankruptcy proceeding filed by myself and my husband, Michael Dickey, on February 25, 2021, pending in the Northern District of Georgia, case number 21-51575.

3.      I have a full-time job with Cox Automotive Corporation where I have worked for over five years. I am a W-2 employee.

4.      Prior to the Covid-19 pandemic my husband owned and operated two Uncle Maddio's pizza franchise locations (the "Restaurants").

5.      While the Restaurants were owned by my husband, they were true family businesses. I spent my nights and weekends at the Restaurants alongside my husband trying to make them successful. I would ring up guests, help the servers take orders and run food, and fill in in the kitchen making pizzas.

6.      I also did all of the human resources related work for the Restaurants, as that is my background.

7.     We worked hard to make the Restaurants inviting places where families, especially those with children, could gather together and dine in-person.

8.     I, along with my husband, personally guaranteed numerous business loans in order to secure financing for the Restaurants.

9.     In March 2020, when the global COVID-19 pandemic struck, we heeded the advice of the CDC, the Georgia Department of Health, and local restrictions from the cities of Smyrna and Acworth and shut our doors to dine-in business for the health and safety of our customers and employees.

10.     We remained open for takeout and delivery but could not survive on the revenue from takeout and delivery alone. The Restaurants could not pay their bills and we were forced to close the Restaurants.

11.     My husband and I tried to avoid personal bankruptcy, but we could not work out payment plans with all of the lenders on the personal guarantees we owed for the business loans.

12.     Ameris Bank got a judgment against us and began to garnish my paycheck as well as a joint bank account.

13.     When we filed bankruptcy we were current on all of our personal obligations, including mortgage payments, car payments and credit card payments.

14.     The sole reason we filed bankruptcy was to deal with the business debt.

15.     My husband and I also own and operate a single-family rental home located at 1998 Pine Hill Circle, Kennesaw, Georgia 30144.

16.     My husband and I are both actively engaged in managing the rental property, which includes paying the mortgage and utilities each month, cutting the grass and maintaining the landscaping, and visiting the property several times each month to perform routine maintenance.


FURTHER AFFIANT SAYETH NOT.


Sworn to and subscribed before me

this 14 day of April, 2021.


_____

Notary Public                                                    Caigie McGaha Dickey


This Affidavit was executed and notarized in counterparts pursuant to Executive Order 04-09-20-01 using a Zoom video call as real-time audio-visual communication technology.

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on April 14, 2021, I filed the foregoing pleading through the Court's CM/ECF system, which caused the parties whose email addresses are listed below to receive electronic service thereof:

**Lindsay P. S. Kolba**    lindsay.p.kolba@usdoj.gov

**Tamara M. Ogier (Sub V Trustee)**    tmo@orratl.com; jc@orratl.com; tmo@trustesolutions.net; ctmo11@trustesolutions.net

**Lisa F. Caplan**    lcaplan@rubinlublin.com,nbrown@rubinlublin.com;akhosla@rubinlublin.com; ruluecf@gmail.com; BKRL@ecf.courtdrive.com

**Lynn L. Carroll**    lcarroll@golderlawfirm.com, mcroxton@golderlawfirm.com

**Michelle Hart Ippoliti**    Michelle.ippoliti@mccalla.com, bankruptcyecfmail@mccalla.com;mccallaecf@ecf.courtdrive.com

**Brian K. Jordan**    ecfganb@aldridgepite.com, bjordan@ecf.inforuptcy.com

**Michael Charles Sullivan**    msullivan@phrd.com

  Dated: April 14, 2021                   Respectfully submitted,

                                 **ROUNTREE LEITMAN & KLEIN, LLC**

                                 */s/ Benjamin R. Keck*
                                 William A. Rountree, Ga. Bar No. 616503
                                 Benjamin R. Keck, Ga. Bar No. 943504
                                 Elizabeth A. Childers, Ga. Bar No. 143546
                                 Century Plaza I
                                 2987 Clairmont Road, Suite 175
                                 Atlanta, Georgia 30329
                                 (404) 584-1238 Telephone
                                 wrountree@rlklawfirm.com
                                 bkeck@rlklawfirm.com
                                 echilders@rlklawfirm.com
                                 *Attorneys for the Debtors*